**CARPENTERS DISTRICT COUNCIL OF NEW ORLEANS AND VICINITY, et al.**

v.

**DILLARD DEPARTMENT STORES, INC., D.H. Holmes Company Ltd., et al.**

**Stephen J. PLESCIA and Alan A. Endermann, for themselves and on behalf of all others similarly situated**

v.

**DILLARD DEPARTMENT STORES, INC. and D.H. Holmes Company, Ltd.**

**Civ. A. Nos. 89–3680, 89–3751.**

United States District Court, E.D. Louisiana.

Aug. 29, 1991.

As Amended Oct. 17, 1991.

---

4. Supra, at Note 1.

William Lurye, Gardner, Robein & Urann, Metairie, La., and R. Monroe Garner, New Orleans, La., for plaintiff class.

J. Forrest Hinton and Stephen P. Beiser, McGlinchey, Stafford, Cellini & Lang, New Orleans, La., for defendant Dillard Dept. Store.

John W. Lindner II, Adams & Reese, New Orleans, La., for defendant Federal Ins. Co.

## ORDER AND REASONS

RONALD A. FONSECA, United States Magistrate Judge.

These consolidated matters are brought pursuant to the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101 *et seq.* and involve a class action composed of "all former employees of either D.H. Holmes Co., Ltd. (Holmes) and or Dillard Department Stores, Inc. (Dillard) "who were involuntarily terminated from employment between May 8, 1989 and August 9, 1989, as a result of the acquisition of Holmes by Dillard and who did not receive sixty (60) days written notice of said termination either personally or through their representative." Defendants are Holmes, Dillard, certain named corporate officers, and directors of the respective corporate defendants and Federal Insurance Company (Federal), indemnity insurer of the corporate officers. Federal has also been named as a third party defendant in connection with policy insuring acts of the fiduciaries of defendants' welfare plans.

The action arose as a result of the termination of class member employees on, and subsequent to May 9, 1989, the effective date of a merger between Dillard and Holmes. Plaintiffs claim that defendants, in violation of the provisions of WARN, failed to give them 60 day advance notification of their termination as an employee and did not pay them the prescribed damages mandated by WARN in lieu of adequate notification. Defendants, on the other hand, contend that they fell within one

or more exceptions of WARN, excusing them from the requirement of furnishing a full 60 day notice of termination, and, alternatively, that all affected employees received the amount of damages that would be due them under WARN, assuming they received less than the required notification.

Before the Court are motions and cross-motions for summary judgment, plaintiffs' Motion to Strike the supporting affidavit of defendants' motion for summary judgment, defendant corporate officers' and insurer's Motions to Dismiss, and Federal's Motion for summary judgment on cross-claim. We will discuss each in their order of consequence.

## BACKGROUND

In 1988, as a result of steadily declining profits and revenues, Holmes, a long established retail department store headquartered in New Orleans, Louisiana, hired the firm of Kidder–Peabody, investment counselors, to seek a solution for its financial problems. Through its efforts, Holmes and Dillard entered into serious negotiations in the latter part of 1988 for the merger of the two corporations. A merger agreement was ultimately reached between representatives of the two parties which was approved by the respective Board of Directors of Dillard and Holmes on March 3 and 6, 1989. One of the conditions of the agreement was that no less than eighty percent (80%) of Holmes' stockholders vote to approve the merger. Preliminary to any vote by the stockholders however, the parties were required to furnish Holmes' stockholders a registration statement outlining the parties' respective financial conditions, which statement required the advance approval of the Securities and Exchange Commission (SEC).

The proposed registration statement was filed with the SEC on or about March 7, 1989.[1] The statement was approved by the SEC on April 10, 1989. Efforts had been made to have the SEC expedite its decision on the statement, however, prior to its ruling on April 10th, neither Holmes nor Dillard could anticipate when the decision would be forthcoming. Having received SEC approval, a Holmes' stockholder meeting was scheduled for May 9, 1989.

On April 19, 1989,[2] at the direction of Dillard personnel, Holmes notified employees assigned to both its Corporate Planning Division and warehouse facilities[3] that they would be terminated effective May 9, 1989, in the event the merger with Dillard was approved by Holmes' stockholders. A second notice was sent to certain "transitional" employees at the above two locations between April 21 and 28, 1989, informing them that they would be laid off between May 9 and July 1, 1989. Finally, a notice was sent on May 12, 1989 informing employees in the Canal Street retail store that they would be laid off between June 10 and July 8, 1989.[4]

Some of the employees receiving the latter notice were discharged during that time frame, while the employment of the rest was extended to a period between July 8 and August 9, 1989.

As stated above, defendants, out of an abundance of caution, paid each affected employee an amount of wages that they determined would be due under WARN, assuming, but not admitting, that they were exempt from providing 60 days notification. Dillard developed a formula for payment which, according to its own interpretation of WARN, satisfied the penalty

1. Three amendments to the registration statement, which are not relevant to our consideration herein, were filed with the SEC between the initial filing date and just prior to April 10, 1989.

2. WARN provides that employees actually receive 60 days notice before a plant is closed. The April 19th date, as well as other notice dates mentioned in this opinion unless identified otherwise, refer to the dates defendants prepared or sent the notices, and not the dates of receipt by the respective employees.

3. Employees in Holmes Planning Division were physically located in a building on Bienville Street but were "assigned" to the Corporation's Canal Street department store for payroll purposes. The Elmwood and Riverbend warehouses were located in Harahan, Louisiana, a suburb of New Orleans.

4. The employees were notified that the Canal Street store would be closed after they were terminated.

provisions of the Act. Under the formula, they construed the 60 day penalty period as set forth in § 2104(a)(1)(A) to be the actual number of work weeks within that period rather than 60 individual days. Dillard determined that this meant each employee not receiving any notice would be entitled to eight (8) weeks of pay. Relying on the provisions of § 2104(a)(2) of the act, Dillard further concluded that it could deduct from this amount (eight weeks of pay, or any portion thereof due), any severance or vacation pay that would be due and paid to the employee. Additionally, under defendants' interpretation of the Act, part-time employees are not "affected employees."

The parties to this action have consented to have this Magistrate Judge try the issues pursuant to 28 U.S.C. § 636(c). Separate trial dates have been set on the severed issues of liability and damages.

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [5]

In this motion, plaintiffs seek a partial summary judgment on liability, as to both full-time and part-time employees, contending that defendants failed to provide them 60 days notice before terminating their employment. Additionally, they contend that they did not receive sufficient payment upon termination as mandated by WARN.

Defendants oppose this motion on the basis: a) that WARN, due to the factual circumstances leading up to the merger in this matter, provides an exception to the requirement that they provide 60 days notice; b) that the officers and directors named as defendants herein are not liable under the Act; [6] and, c) the WARN Act is unconstitutional.

Essentially defendants' opposition to plaintiffs' motion for partial summary judgment, with the exception of the claim that the Act is unconstitutional, is based, in several respects, on the meaning and interpretation of the Act's provisions.

Ordinarily, prudence would dictate that we refrain from considering the manner in which the Act should be interpreted until its constitutionally has been determined. However, much time and energy has already been expended by counsel for the parties and by the Court on the instant motions and separate trial dates on liability and damages are set respectively for the weeks of September 23 and October 21, 1991. It would be helpful to the parties, and the progress of this litigation, that they be made aware, as early as possible, of the interpretation we place on the provisions of WARN, assuming we find the Act meets constitutional muster, to enable the parties to proceed to trial on the issues resolved in the motions before us. Therefore, pursuant to FRCP Rule 56(d),[7] we enter the following findings of fact and conclusions of law which will be deemed established at trial in this matter.

The WARN Act, which became effective on February 4, 1989, is intended to provide

---

**5.** In opposition to plaintiffs' motion for partial summary judgment, defendants have raised, for the first time in this action, the issue of the constitutionality of the WARN Act. We question the procedural vehicle defendants have chosen to attack the validity of the Act since they have not raised the unconstitutionality of the Act as a defense in their answer nor have they filed a motion to dismiss this lawsuit on that basis. The immediate effect a ruling in defendants' favor on this point may be only to defeat plaintiffs' motion for summary judgment and not a dismissal of the action. We need not decide this procedural issue at present since we must pretermit a decision on the constitutionality of the Act pending the United States intervention in this action. 28 U.S.C. § 2403. See Minute Entry dated July 3, 1991.

**6.** This issue will be addressed later in this opinion in connection with defendants' motion to dismiss these individuals from the suit.

**7.** Rule 56(d) provides:

If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

protection to workers, their families and communities by prohibiting certain employers from ordering a plant closing or mass layoff until 60 days after notice of the layoff is given to the employees and/or their union. 20 C.F.R. 639.1.

The Act provides in relevant part:

An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order—

(1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and

(2) to the State dislocated worker unit ... and the chief elected official of the unit of local government within which such closing or layoff is to occur.

29 U.S.C. § 2102(a).

The Act defines "employer" as:

any business enterprise that employs—

(A) 100 or more employees, excluding part time employees; or

(B) 100 or more employees who in the aggregate work at least 4000 hours per week (exclusive of hours of overtime).

29 U.S.C. § 2101(a)(1).

The Act defines "plant closing" as

The permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2101(a)(2).

Employers who violate the 60 day advance notice provision are liable to each aggrieved employee for back pay and employee benefits for the period of the violation. 29 U.S.C. § 2104(a).

 Defendants admit that both Dillard and Holmes are "employers" under the WARN Act. (Defendants' response to plaintiffs' statement of facts, paragraphs 1 and 2). Additionally, defendants have not contested that the closing of several Holmes stores and/or warehouses constituted "plant closings" under the Act.[8] Therefore, at least with regard to Dillard and Holmes, we find that the Act is applicable, and that 60 days notice should have been given to the terminated employees unless these defendants can set forth some basis which would justify failure to give advance notice under the Act.[9]

---

**8.** Defendants contend that the Corporate Planning Division and Riverbend warehouse should be considered separate sites under the Act. They argue that due to the lack of requisite personnel assigned to these sites, their closings were not subject to the provisions of WARN. There exist disputed factual issues as to whether the aforementioned sites should in fact be considered as separate sites. We reserve our ruling on this issue until after trial.

**9.** Holmes is only responsible for giving notice to those employees who were terminated on May 9, 1989, the effective date of the merger. Dillard is responsible for giving notice to employees laid off subsequent to that date. Section 2101(b)(1) of the Act provides in part:

In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff ... up to and including the effective date of the sale. After the effective date of the sale ... the purchaser shall be responsible for providing notice for any plant closing or mass layoff....

Viewed alone, this section appears susceptible to two different interpretations. One requiring the seller to provide notice before the effective date of sale for any layoff which would occur up to 60 days after the effective date of sale. The other interpretation being that the seller is responsible only for notice of layoffs occurring up to and including the date of sale, the buyer being responsible for notices of layoffs after the sale. However, when considered with § 2102, it is clear that the latter interpretation is the correct one. While we generally speak of WARN in terms of requiring that an employee be given at least 60 days notice before a layoff, § 2102 directs that "an employee shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice...." Section 2102's direction is towards the employer who has the power and authority to order a plant closing. It is presumed that in the ordinary situation a seller does not retain that power past the date of sale. Additionally, if Congress intended the first interpretation above, the inclusion of the phrase "for any plant closing or mass layoff" in each of the two sentences

Defendants contend that they could not have given notice of the layoffs 60 days before they occurred because at that point it was not clear when and if any layoffs would occur. The anticipated store closings and layoffs were something that Dillard was planning to put into effect only in the event that the merger took place. Thus, defendants contend that because the merger was an uncertain event until the SEC approved the transaction (approval occurred on April 10), the notice could not have been given any earlier than it was given, April 19, 1989.

Additionally, defendants urge that it was not certain that Holmes' stockholders would approve the merger, thereby further complicating any efforts to provide advance notice of the layoffs.

Much time is spent in argument, on both sides, to convince the Court, on the one hand, that defendants could have furnished termination notices earlier than they did, and, on the other, that they were prevented from doing so due to the uncertainties listed above. However these arguments of the parties are only relevant if defendants qualify under one or more of the listed exemptions in the Act allowing for less than 60 days notice.

The following exemptions are set out in the Act:

(1) an employer may order the shutdown of single site of employment before the conclusion of the 60–day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that the giving the notice re-

quired would have precluded the employer from obtaining the needed capital or business.

(2)(A) An employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

(B) No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

(3) An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period.[10]

29 U.S.C. § 2102(b).

It is undisputed that the written notices which were given to defendants' employees did not contain any type of statement of why they were not being given 60 days notice of their impending layoff. See plaintiffs' motion, exhibits B and C. Plaintiffs contend that by not providing such a statement, defendants have left the employees guessing as to why the notice period was less than 60 days. They contend that now defendants are attempting to benefit from the omission by not being limited to the reasons given in the notice. Thus, plaintiffs contend that because defendants did not specifically state in the notices a basis for reducing the notice period, defendants are estopped from asserting that any exceptions are applicable.

---

delineating the obligations of the seller and buyer would be superfluous. While final regulations promulgated by the Department of Labor (Department) which became effective May 22, 1989 are in accord, 20 C.F.R. 639.4(c), notices were sent prior to the effective date of the regulations. We need not determine the effect of either the interim interpretations or final regulations regarding this issue since we reach our conclusion independent of either. Neither *Holmes* nor *Dillard* contends that the responsibility for giving notice in this case fell to one or the other. Holmes did in fact send out notices

to employees terminated on the date of the merger.

**10.** The requirement of providing a brief statement of the basis for reducing the notification period is specific and unambiguous. The *Department of Labor, in both the interim and final regulations,* states that the employer must, at the time notice actually is given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements required in a notice. 20 C.F.R. 639.9. The regulations restate the statutory requirement.

Defendants, on the other hand, point out that the Department of Labor has stated that minor errors in notices will not be a basis for a WARN violation. 20 C.F.R. 639.7(a)(4). Moreover, they contend that the law should not be read to require that a "legal brief" accompany a notice to employees. Finally, defendants contend that plaintiffs have not been prejudiced by the failure of the notices to contain the reasons for the shortened notice.

■ We conclude that the failure of an employer to state in the notice the reason why the time period has been shortened results in a defective notice. It is unclear from the Act and regulations, however, what effect we are to give this defective notice. Since it constitutes at least *de facto* notice, would an employer who qualifies under one of the exemptions be precluded from claiming the exemption in the absence of genuine prejudice to the employee? We need not reach this question since that provision of the Act requiring the reason to be given in the notice only has application if an employer qualifies for an exemption, which defendants herein do not.

■ We address first "the faltering company" exception.

The exception in the Act provides that: (1) an employer may order the shutdown of a single site of employment before the conclusion of the 60–day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business. 29 U.S.C. § 2102(b)(1).

Defendants contend that this exception is applicable to this case. They contend that the evidence shows that Holmes, prior to the merger with Dillard, was seeking additional capital, without which Holmes may not have been able to stay in business.

The evidence reveals that in February of 1989, the Whitney Bank cut off Holmes' $10 million line of credit, and that around the time notice of the May 9th layoffs would have been required (March 9th), Holmes was seeking capital to replace this line of credit. On March 15, 1989, Holmes obtained from American National Bank a $6.5 million line of credit. Additionally, American National Bank agreed to supply Holmes with an additional $3.5 million line of credit for the fall in the event that the merger did not take place. See exhibits to plaintiffs' motion, Ammon dep. pp. 8–10, 25–26; exhibit A (Proxy statement) at page 12.

Defendants contend that Holmes believed that providing notice to employees on March 9th of potential layoffs may have affected American National Bank's willingness to extend the line of credit Holmes was seeking. See Defendants' exhibit 1, opinion of Price Waterhouse to the effect that a notice of possible termination before the merger was approved by the shareholders and before federal regulatory approval was obtained would have jeopardized Holmes' ability to obtain capital from American National Bank. Defendants also contend that the line of credit Holmes was seeking was essential to Holmes' business operation if the merger had not been completed. In addition, defendants cite deposition testimony to the effect that Holmes was afraid that giving early notice would cause Holmes' employees to be hired by other retailers. Schuler dep. pp. 39–41 (exhibit 1 to defendants' supplemental memorandum). Therefore, defendants contend that the "faltering company" exception applies.

The circumstances presented by Holmes do not appear to be the type contemplated by the "faltering business" exception. Although it is clear that Holmes was, in fact, seeking capital, this is not enough to show that the exception applies. Defendants would have to show that the capital that was sought would have enabled the employer to avoid the plant closing or postpone it. However, the entity seeking the capital, Holmes, was not the same entity which was planning the layoffs. The evidence clearly establishes that the decision

to lay off employees and/or close stores was made by Dillard and was dependent upon the actual merger taking place. See plaintiffs' exhibits, Johnston depos. at p. 58; Darr depos. at p. 54. Thus, the fact that Holmes was seeking capital was not directly related to the fact that employees were laid off. The failure of Holmes to have obtained the capital it sought may, perhaps, have required store closings or layoffs due to Holmes' financial condition; however, those speculative layoffs and plant closings are not at issue in this case.

It should be noted that under the exception, the employer must have been seeking capital which, if obtained, would have delayed or avoided the plant closings. However, here Holmes was successful in getting the capital it sought, but the plant closings nevertheless occurred as a result of the merger with Dillard's subsidiary.

In addition, even if this exception would apply to the May 9th layoffs, it would not apply to the Canal Street layoffs which occurred between May 9th and August 9th of 1989. Darr, Dillard's general counsel, admitted that Dillard was not a faltering company at that time and was not seeking capital at that time. Darr depos. p.p. 134–135, attached to plaintiffs' supplemental memorandum.

Neither Holmes nor Dillard qualify as a "faltering business" under the Act.

■ We next address the "unforeseeable business circumstances" exception which is defined in the Act as follows:

> (2)(A) An employer may order a plant closing or mass layoff before the conclusion of the 60–day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required. 29 U.S.C.A. § 2102(b)(2).

Defendants contend that this exception also applies to this case. They contend that although the merger was foreseeable in the sense that both Holmes and Dillard wanted it to take place and had negotiated to achieve its occurrence, the actual time the merger would take place was unforeseeable and unexpected because they did not know when the SEC would approve the transaction or whether or not the Holmes shareholders would approve the merger.

The evidence reveals that actual SEC approval for the merger did not take place until April 10, 1989, only nine days before the April 19th notices went out to the corporate employees and the warehouse employees. Moreover, there is deposition testimony to the effect that there is no time limit for the SEC to approve a transaction, and that no one could have predicted when approval would take place. See defendants' exhibit K and JJ (deposition testimony of Benham and Johnston).

Defendants contend that until SEC approval on April 10th, a closing date for the merger could not have been scheduled.

To fall within this particular exception, the Act requires that a "business circumstance(s)," which was not reasonably foreseeable "*caused* the closing or mass layoff." [Emphasis added]. The "business circumstance" which allowed (as distinguished from "caused") the layoffs of Holmes' personnel was the merger that occurred on May 9, 1989. Defendants emphasize in argument the lack of certainty as to when the SEC might have approved the offering or whether Holmes' stockholders would eventually approve the merger, as the principal circumstances bringing them under the exception to the Act. These events in themselves, however, did not "cause" any layoffs, but were merely "links in a chain" of events leading up to the timing of a merger that was contemplated and sought by both defendants for approximately six months.

Further, the merger itself did not cause the layoffs, but merely provided Dillard the opportunity, albeit for economic reasons, to lay off employees. We do not interpret the Act as allowing a decision to lay off employees based on any economic factor, such as to merely reduce costs, to fall within the exception to the Act, but rather only those decisions based on unforeseeable business or economic circumstances that by their

very nature necessitate or impel the closing of a plant.[11]

■ In viewing all of the exceptions in the Act together, it is obvious that Congress intended only that unusual, unexpected and significant events, beyond the control of the employer, would excuse him from furnishing the full 60 day notice.

However, assuming ambiguity in the terms used in connection with the second exception, resort to the legislative history of the Act clears away any uncertainty as to the impelling economic basis required for this exception.[12]

The House Conference Committee report states, with regard to "Unforeseeable Business Circumstances," that:

> The Conferees recognize that there may be cases in which unforeseeable events necessitate a plant closing or mass layoff and it is not economically feasible to require the employer to give notice and wait until the end of the notice period before effecting the plant closing or mass layoff. For example, a natural disaster may destroy part of a plant; a principal client of the employer may suddenly and unexpectedly terminate or repudiate a major contract; or an employer may experience a sudden, unexpected and dramatic change in business conditions such as price, cost, or declines in customer orders. In these situations, the employer is required to give notice as soon as the closing or mass layoff becomes reasonably foreseeable, but the employer is permitted to implement the

proposed closing or layoff without waiting until the end of the full notice period.
1988 U.S.Code Cong. & Admin.News 2082.

Defendants do not qualify for the exemptions set forth in § 2102(b).

*Compliance with the Penalty Provision of the Act*

Defendants contend alternatively, that even if thy are found to have violated the notice requirements of WARN, plaintiffs have been paid all that is due them under the penalty provisions of the Act.

Those provisions are as follows:

(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(A) back pay for each day of violation at a rate of compensation not less than the higher of—(i) the average regular rate received by such employee during the last 3 years of the employee's employment; or (ii) the final regular rate received by such employee; and

(B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than

**11.** It is somewhat anomalous to consider that had either the SEC failed to approve the statement or the stockholders voted against the merger, that none of the affected employees would have lost their jobs when they did. Holmes had sufficient funding to continue operation at least through the fall of 1989. One can only speculate under those circumstances when and if Holmes' employees would have eventually been terminated.

**12.** Both the interim interpretations and final regulations of the Labor Department are in accord with our interpretation. 20 C.F.R. 639.-9(b). The final regulations of the Department of Labor appear to meet the criteria of "substantive rules" and, therefore, are entitled to the force and effect of law. *Chrysler Corporation v.*

*Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *United States v. Harvey,* 659 F.2d 62 (5th Cir.1981). Somewhat troubling, however, may be attempting to apply the final regulations, which became effective May 22, 1989, to actions of defendants relating to WARN, which occurred prior to that date. Ordinarily, regulations would not be applied retroactively. However, considering the provisions of WARN in its entirety, defendants would not be prejudiced if we were to rely on the regulations in interpreting the Act. If any claimed ambiguity exists in the Act and defendants establish reasonable grounds for believing that the act or omission was not a violation of WARN, the Court may reduce the amount of liability or penalty.

one-half the number of days the employee was employed by the employer.

The amount for which an employer is liable under paragraph (1) shall be reduced by—

(A) any wages paid by the employer to the employee for the period of the violation;

(B) any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation; and

(C) any payment by the employer to a third party or trustee (such as premiums for health benefits or payments to a defined contribution pension plan) on behalf of and attributable to the employee for the period of the violation.... § 2104(a).

The defendants calculated the payments that would be due under this provision of the Act by first assuming that the reference to 60 days meant the number of workweeks falling within a 60 day period (eight weeks) and not 60 individual work days. After deducting from this eight-week period the amount of notice actually given an employee, they determined how much severance and vacation pay was due the employee and counted this amount as fulfilling their obligation under WARN's penalty provisions.

We find, however, that the time period for which penalty payments would be due are 60 individual work days and not the number of work weeks contained within a 60 day period. Additionally, it was improper for defendants to use severance and vacation pay as a setoff for payments required under WARN since payments of these items were required by law and would be due defendants' employees regardless of the applicability of WARN.[13]

*Sixty Day Provision for Back Wages*

◼ WARN provides that as a penalty for failing to give adequate notice, the employee is entitled to "back pay for each day of violation." § 2104(a)(1)(A). Plaintiffs contend that defendants incorrectly calculated the number of days for which back pay was owed. Defendants determined that for the employees terminated on May 9, 1989, approximately eight weeks notice was required, and since three weeks notice was given, they determined that the employees were entitled to five weeks of back pay. The calculation for the other terminated employees was made in the same manner. Plaintiffs contend, however, that the employer's liability is not for each day of work missed but for each calendar day that notice is lacking. Thus, for example, plaintiffs contend that since the employees who were terminated on May 9 only received 20 days notice, they are entitled to 40 eight hour days of back pay, not five weeks of back pay.

One court has interpreted the Act's 60 day provision as the plaintiffs contend. In *United Electrical Radio & Machine Workers v. Maxim, Inc.*, 5 IER Cases 629 (D.Mass.1990), (a copy is attached as part of Exhibit 2 to plaintiffs' memorandum), the court calculated the employer's liability by determining that 64 employees had not been given notice and so multiplied 64 employees times 8 hours of work times $10.60 per hour, times 60 days, for a total of $325,632.00 owed in back pay for the workers. However, the method used by the court was not disputed, and thus was not an issue in that case. Therefore, that case is dicta as to the proper method for determining how to calculate the number of days for which back pay is owed.

Defendants contend that the WARN Act, as a remedial statute, was intended to place the affected employees in the position they would have been in had no violation—in other words, if they had the full 60 days notice required by WARN. Thus, employees should be compensated for the actual number of days they would have worked during the period of the WARN violation. Defendants contend that to hold otherwise would convert WARN Act from a remedial statute into a punitive statute. Additionally, defendants point out that § 2104(a)(3) of the Act expressly provides for "civil penal-

---

**13.** No reference is made by defendants to any attempt by them to include welfare benefits that were due under § 2104(a)(1)(B) in their computation of penalties that would be due under the Act.

ties" in favor of local government. They contend that if Congress had intended the general back pay provisions applicable to all WARN employers to provide for back pay penalties, it would have expressly stated this intent.

We see nothing in the Act which supports defendants' interpretation. The liability provisions of the Act are clear, eliminating any need for a resort to outside sources to determine Congress' intent. "An employer ... shall be liable ... for *back pay for each day of violation....*" § 2104(a)(1)(A). [Emphasis added].

There is no rational explanation for inclusion in the Act of the phrase "for each day of violation" if Congress intended to limit an employee's recovery only to wages he would have earned during the period of the violation.

*Severance Pay*

█ Section 2104(a)(2)(B) provides that the amount for which an employer is liable may be reduced by any voluntary and unconditional payment to the employee that is not required by any legal obligation.

Plaintiffs contend that severance pay was required under the law, and, therefore cannot be credited against the payments required under the WARN Act.

Congress, in its Conference Report, stated with respect to the offset provisions of WARN that:

> payments owing because of written or oral agreement, and made on account of the employment loss, would not offset the back pay remedy. Such payments may include severance pay, pension benefits or any other kind of benefit that an employee is entitled to receive. These are benefits that are payable as compensation for past services because a layoff or shutdown has occurred, whether or not the terms of the layoff or shutdown actually violate the Act. In addition, they are benefits that an employee would not receive if employment had continued.

1988 U.S.Code Cong. & Admin.News at 2086.

It is undisputed that the severance pay due herein was computed with reference to the Bulletins attached to plaintiffs' memorandum as exhibits R and S, which provide that full time employees will be paid separation pay according to the schedule in the bulletin. Johnston (a Holmes' officer) stated in his deposition that any employee laid off or terminated without cause in any other situation would receive severance pay. Johnston deposition at p. 88. The Holmes' severance pay plan was adopted by Dillard in the merger. Exhibit A to plaintiffs' motion for summary judgment, at B 10.

Plaintiffs contend that Holmes' plan for payment of severance pay constituted an ERISA (Employee Retirement Income Security Act) plan. Under ERISA, an employee welfare benefit plan is defined to include:

> Any plan, fund, or program which was ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) ... unemployment, or vacation benefits, ... or (B) any benefit described in Section 186(c) of this title....

29 U.S.C. § 1002(1). Section 186(c) specifically lists severance benefits; thus, plans which provide severance benefits to employees are included in the definition of employee welfare benefit plan. Moreover, courts have found severance pay plans to be ERISA plans. *See Blau v. Del Monte Corp.,* 748 F.2d 1348, 1352 (9th Cir.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.1990), cert. denied, — U.S. —, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

Defendants cite *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), for the proposition that one-time severance payments such as the ones that were made in this case, do not constitute an ERISA plan. However, that case merely held that a Maine statute which required employers to provide one time severance payments to employees in

the event of a plant closing neither established nor required an employer to establish and maintain an ERISA plan; thus, the Maine statute was not preempted by ERISA. That case did not hold that an employer who establishes and maintains a plan for payment of severance benefits to its employees does not establish an ERISA plan.

Additionally, it should be noted that in an unrelated case in this Court, Holmes and Dillard admitted that the Holmes severance pay plan constituted an ERISA plan. In *Krajcer v. Dillard Dept. Stores and D.H. Holmes*, CA No. 90–1015 (E.D.La.1990), plaintiff, a former Holmes' employee, sued Dillard and Holmes for their failure to pay her severance pay under the Wage Bulletin. In their answer to Krajcer's complaint, Dillard and Holmes stated that the severance pay plan entitled the employee to one week of salary for each year of service and further stated "that the severance pay plan was an employee welfare benefit plan covered by [ERISA]." Exhibit T to plaintiffs' memorandum. Additionally, Holmes and Dillard stipulated in the pre-trial order in that case that it was an ERISA plan. Exhibit V to plaintiffs' memorandum.

Central to the Judgment rendered in favor of the plaintiff in *Krajcer* and to the Court's jurisdiction was that the severance plan, which was the identical plan involved in this matter, was a plan under ERISA.

In *MacMillan Bloedel, Ltd. v. Flintkote Co.*, 760 F.2d 580 (5th Cir.1987), the Fifth Circuit ruled that a court could take judicial notice of related proceedings and records, including pleadings and files in cases before the same court. *Id.* at 587. Therefore, plaintiffs request that this Court take judicial notice of the proceedings and pleadings in *Krajcer*. We conclude that defendants are collaterally estopped from contesting that their severance pay plan was an ERISA plan.

A party may be collaterally estopped from re-litigating an issue determined in a prior judgment under the following conditions: "(1) that the issue at stake be identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and, (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action." *Wehling v. Columbia Broadcasting System*, 721 F.2d 506, 508 (5th Cir.1983); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158 (5th Cir.1981); *McDuffie v. Estelle*, 935 F.2d 682 (5th Cir.1991). Offensive use of collateral estoppel is recognized, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and complete identity of the parties in both suits is not essential. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In *McDuffie*, the Court appears to add an additional factor to be considered before applying estoppel, which is, that no special circumstances exist that would render preclusion inappropriate or unfair.[14]

*Krajcer* involved a claimed entitlement to severance pay under Holmes' (Dillard) ERISA plan. The administrator of the plan had determined that plaintiff's failure to accept another job position in lieu of termination resulted in her forfeiture of severance pay. The District Judge found the administrator's interpretation to be erroneous and awarded judgment to plaintiff.

The issue in *Krajcer* is identical to the issue before us, i.e., whether defendants' severance pay falls under an ERISA plan. An opportunity to fully litigate the issue was present in *Krajcer*. Defendants did not dispute that the severance pay plan was covered by ERISA, rather they judicially admitted that it was. The determination of the issue in *Krajcer* was a critical and necessary part of the judgment, not only in that the judgment was based on an interpretation and application of the law governing ERISA plans, but that the plan under consideration was acknowledged to be an ERISA plan. The very jurisdiction of the Court was bottomed on the ERISA statute. We perceive no special circumstance which would have provided a disincentive to defendants not to have vigorous-

---

14. *McDuffie*, at 684–85.

ly litigated the issue of whether the plan was an ERISA plan, in the prior litigation.[15]

One of the fiduciary duties of the administrator of an employee welfare benefit plan under ERISA is to administer the plan in accordance with its plain terms. 29 U.S.C. § 1104(a)(1)(D). Therefore, since the severance pay plan (the bulletin) clearly provides that employees terminated without fault were entitled to separation pay, the payment of severance benefits to the terminated employees was required by ERISA. Thus, those payments may not be credited to the payments required under WARN since WARN allows a set off for voluntary and unconditional payments not required by any legal obligation.

*Vacation Pay*

 Plaintiffs contend that vacation pay is also not a permissible credit against the payments required by WARN because these payments were required by law.

The Holmes bulletins (also included in Exhibits R and S to plaintiffs' memorandum) provided, with regard to vacation pay, that:

> When an employee resigns or is terminated for any reason, he will be paid for unused vacation according to the following schedule. Whether or not an employee was terminated for cause is immaterial. If his length of service entitles him to vacation time and there is some unused vacation remaining, he must receive the equivalent amount of time in pay. . . .

The Supreme Court has stated that unlike severance pay, a plan to pay employees for unused vacation time out of the general assets of the corporation was not an ERISA plan. *Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989).

However, Louisiana law states that an employee upon discharge or resignation shall be paid "the amount then due under the terms of employment" within three days. La.Rev.Stat. § 23:631. Louisiana jurisprudence has interpreted the definition of "amounts due under terms of employment" to include vacation benefits. *Draughn v. Mart*, 411 So.2d 1188, 1190 (La.App. 4th Cir.), *writ denied*, 415 So.2d 944 (La.1982); *Morris v. Parish Radio Service Co.*, 444 So.2d 162 (La.App. 1st Cir. 1983); *Tompkins v. Schering Corp.*, 441 So.2d 455 (La.App. 2d Cir.1983); *Blankenship v. Southern Beverage Co.*, 520 So.2d 440 (La.App. 1st Cir.1988); *writ granted*, 522 So.2d 574 (1988), dismissed on joint motion; *Potvin v. Wrights Sound Gallery, Inc.*, 568 So.2d 623 (La.App. 2nd Cir.1990). Thus, plaintiffs contend that since defendants were required by law to pay the terminated employees for their unused vacation time as set forth in the bulletin, the payment of vacation benefits cannot be credited toward the payments required under WARN. *See Jones v. Kayser–Roth Hosiery, Inc.*, 748 F.Supp. 1292, 1301 (E.D.Tenn.1990) (employer not entitled to a credit for vacation pay which it was legally obligated to pay under the terms of the employer's policies and procedures manual and state law). Defendants, therefore, improperly credited vacation pay benefits against WARN benefits.

Defendants contend that the question of the sufficiency or insufficiency of the payments made to the terminated employees should not be decided on a motion for summary judgment. They contend that the documents signed by the employees at the time of their termination did not specify or itemize the amounts that were being paid as supplemental WARN pay; thus, they contend that it is impossible to determine how much of the amount paid to each employee was for severance pay, vacation benefits, or supplemental WARN pay.

However, although such a dispute may preclude the Court at this time from determining exactly how much the defendants owe to each of the terminated employees, it does not preclude the Court from determining whether or not, as a matter of law, severance pay and/or vacation pay may be credited against the payments required by WARN.

---

15. *Krajcer* is presently pending on appeal. However, regardless of its outcome, the factors justifying the application of collateral estoppel would not be changed.

*Employees Entitled to Damages*

The Court has defined as class plaintiffs in this action:

> ... all former employees of D.H. Holmes Co., Ltd. (Holmes) and/or Dillard Department Stores (Dillard) who were involuntarily terminated from employment between May 8, 1989 and August 9, 1989, as a result of the acquisition of Holmes by Dillard and who did not receive sixty (60) days written notice of said termination either personally or through their representative. . . .

The amount of damages each plaintiff would be entitled to recover however depends on the period of notice actually received by that employee. The class definition, however, does not specifically address those employees whose notices indicated they could be terminated within a certain time frame and that either the last date of possible termination contained in the notice, or the date that the employee was actually discharged, was at least 60 days from the date notice was received. A determination must be made whether employees who fall in that category are to be considered members of the class.

■ We conclude that in those instances where an employee was advised that he would be terminated between two set dates, and the earliest set date was less than 60 days from the date notice was received, the employer has failed to comply with the Act. This is so even if the latest set date was at least 60 days from the date notice was given, or the employee was actually discharged more than 60 days from receiving notice. Notice that sets the earliest date an employee could be discharged, at less than 60 days from receipt of notice, by its very terms, fails to meet the requirements of the Act.[16]

However, we do not believe that notification, which is inadequate solely because it might provide for termination earlier than 60 days, should be considered as no notice at all. As to those employees who were given conditional notices, actual notice will comprise the number of days between the date notice was received and the first date which an employee was notified he could have been discharged, whether or not he was discharged at a later date.[17]

By the same token, those employees whose termination dates may have been extended and were actually terminated more than 60 days from date of notice would nevertheless be entitled to damages under the Act for the period from the earliest termination date that they were notified they could be terminated. Maintaining employees on the payroll past dates set forth in an inadequate notice does not cure or convert the inadequate notice into one that is adequate. Any salary or other benefits earned by an employee during the extended period could of course be credited against any damages found to be due.

*Defendants' Motion For Partial Summary Judgment*

Defendants contend that the affidavit of Allen Williams, Dillard's director of employee services, along with the exhibits to that affidavit, demonstrate that the following groups of former Holmes employees should be dismissed from the class: 1) part-time and extra on call employees because they were not Dillard's employees within the meaning of the WARN Act; 2) employ-

---

16. The permanent regulations defines the term "date" as "... a specific date or to a 14–day period during which a separation or separations are expected to occur." 20 C.F.R. 639.7(b). The regulations further state that where the 14–day period is used, the first day of the period must fall at least 60 days from the date of the notice. The interim regulations contained no similar provision. In reaching the conclusion above, we do not resort to either the permanent regulations or its predecessor, as we determined whatever effect they would have in the instant case, neither would be applicable to the situation herein presented. These regulations only define what notices comply with the 60 day require-

ment in the Act. As we determined above, the starting date of a period during which an employee could be discharged, which is less than 60 days from the date of notice, does not constitute the notice required under the Act. The regulations do not address how the courts are to treat notices determined to be inadequate.

17. If the facts reflect that an employee was discharged before the earliest date contained in the notice, then the defendants would only be entitled to a credit from the date of notification to the date of discharge.

ees who actually received the 60 days notice required under the Act; 3) employees of Holmes' Riverbend Warehouse facility, the employees of which were not entitled to notice because less than 50 employees from that site were laid off; and 4) employees of the Holmes Store Planning Department, again because less than 50 employees from that site were laid off.

Defendants also contend that they are entitled to summary judgment as to the claims against the individual defendants (officers and directors of Dillard and of Holmes)[18] because these defendants are not employers within the meaning of the WARN Act.

Defendants' motion is denied in part, insofar as it seeks to dismiss, as class plaintiffs, employees at the Riverbend Warehouse, the Planning Department and those employees who actually received 60 days notice.

The definitions of both "plant closing" and "mass layoff" require that at least 50 employees be laid off at a "single site of employment." § 2101(a)(2) and (3). There is insufficient evidence before us to enable us to determine if Riverbend and the Bienville (Planning Department) locations meet the definition of a "single site." Therefore, a decision on this issue will be pretermitted until trial on the merits.

Employees who actually received 60 days notice are already excluded from this suit under the definition of those who comprise the class membership. However, in light of the conclusions of law set forth elsewhere in this opinion, it would appear that those individually named employees in defendants' motion have not received 60 days notice and have not been fully compensated under the terms of the Act. Therefore, summary judgment as to them would be inappropriate.

*Part–Time Employees*

Defendants contend that among the Canal Street store employees terminated were 67 part time employees who worked less than 20 hours per week and 12 employees classified as "extra on-call" because they did not work a regular schedule and would be called to work less than 20 hours per week on an as-needed basis. Williams' affidavit, paragraphs 10 and 11. In addition, they contend that 20 employees at the Canal Street store had been employed at that location for less than six months prior to the time they received notice that they would be laid off. Williams' affidavit, paragraph 12. Defendants contend that these employees are all considered to be part-time employees under the Act, and, as such, did not become Dillard employees at the time of the merger; therefore, they were not entitled to notice by Dillard.

■ Under the WARN Act, the term "part-time employee" means an employee who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required. § 2101(a)(8). Thus, defendants are correct in contending that the Canal Street employees who worked less than 20 hours per week or who were employed for less than six months are part-time employees under the Act. In addition, the Act provides, in pertinent part, that the term "employer" means "any business enterprise that employs-(A) 100 or more employees, excluding part-time employees ..." Thus, under the Act, part time employees are not considered in determining whether a company is an "employer" within the meaning of the Act.

■ However, under the Act, part-time employees are affected employees who are entitled to notice of a mass layoff or plant closing under the Act. The Act requires an employer to give such notice to each "affected employee." § 2102(a). "Affected employee" is defined in the Act to mean "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." § 2101(a)(5). Part-time employees are not

---

**18.** William Dillard, II, Alex Dillard, James E. Darr, Jr., John Hawkins, James I. Freeman, Roy Grimes, Chuck Franzke, Mike Bowen, Jim Wilson, Allen Williams, Donald W. Johnston and James E. Ammon.

specifically excluded under this definition. If Congress intended that they not be covered under the Act, it would have been easy to have excluded them under the definition, as they had been excluded in other parts of the Act. Therefore, under the Act, part-time as well as full-time employees may be affected employees entitled to notice.[19]

▆ Defendants nevertheless contend that the part-time employees were not entitled to notice by Dillard, relying on Section 2101(b)(1) of the Act, which provides that:

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff ... up to and including the effective date of the sale. After the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice for any plant closing or mass layoff ... *Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.*

§ 2101(b)(1). [Emphasis added]. Defendants contend that under this provision, at the time of the merger, only full time employees became the employees of Dillard; part-time employees did not. Therefore, since the part-time employees were not the employees of Dillard, Dillard was not required to give them notice of a plant closing or mass layoff.

Plaintiffs, on the other hand, contend that defendants' interpretation of this provision leads to absurd results. They contend that, taken to its conclusion, that interpretation would mean that if Dillard hired someone as a part-time employee on May 10, the day after the merger, and the new part-time employee was laid off on July 15 as part of the Canal Street store closing, the new employee would be enti-

tled to notice; however, someone who had been a Holmes part-time employee prior to the merger would not be entitled to notice. Plaintiffs contend that this is an illogical result. They contend that instead, the Act should be interpreted to mean that Holmes' full-time employees remained full-time employees after the merger, while part-time employees remained part-time employees.

Plaintiffs additionally contend that the last sentence of Section 2101(b)(1) was added because otherwise, every time part or all of a business was sold, the employees would suffer an "employment loss" within the meaning of the Act and the seller might be required under the Act to give 60 days notice despite the fact that the purchaser would retain the employees as the purchaser's employees. Plaintiffs contend that to avoid this result, the last sentence of Section 2101(b)(1) was added to provide that the seller's full-time employees would automatically become the purchaser's full-time employees; therefore, notice would not be required if employees were not actually terminated. Plaintiffs point out that if the Act did not contain this provision that full-time employees would automatically become the full-time employees of the purchaser, then once Dillard continued their employment, all of the employees would be part-time employees for six months because they would have been employed by Dillard for less than six months. Thus, during the first six months after the purchase, Dillard could terminate any and all employees and not be required to give anyone notice, since plant closings and mass layoffs require the termination of 50 or more employees excluding part-time employees. Plaintiffs contend that the last sentence of 2101(b)(1) was designed to close this loophole by providing that the employment of full-time employees would be continuous.

We conclude that plaintiffs' analysis of the above provision to be the correct one. We find that part-time employees are af-

---

**19.** Both the interim and final regulations promulgated by the Department of Labor provide that "while part-time employees are not counted in determining whether plant closing or mass layoff thresholds are reached, such workers are due notice." 20 C.F.R. 639.6(b).

fected employees under the Act entitled to notice.

A decision as to whether the "extra on call" employees could be considered "affected employees" is difficult considering the present state of the record. Whether they are "affected employees" would depend on each of those employees' individual situations both before and after the merger. We reserve our ruling on these individuals until after trial on the merits.

*Liability of the Individual Defendants*

█ In this suit, plaintiffs have not only sued Dillard and Holmes for failure to give adequate notice under the WARN Act, but have also sued various officers and/or directors of Holmes and/or Dillard. Defendants contend that the individuals are not "employers" under the WARN Act, and thus are not liable under that Act.

As noted above, the WARN Act defines "employer" as:

any business enterprise that employs—
(A) 100 or more employees, excluding part time employees; or
(B) 100 or more employees who in the aggregate work at least 4000 hours per week (exclusive of hours of overtime).

§ 2101(a)(1). The Act does not define "business enterprise."

With regard to the definition of "employer" and the meaning of the term "business enterprise" under the Act, the Department of Labor, in its interim regulations, has stated as follows:

Commenters have raised a range of interpretative issues having to do with the meaning of the term "business enterprise" and the form of a business organization. These include whether and to what extent subsidiaries which are wholly or partially owned by a parent company are separate employers for the purpose of WARN, and to what extent independent contractors can be considered separate from their business clients. Questions have been raised regarding coverage of non-profit organizations, and public and quasi-public organizations which perform commercial work.

In response to questions raised, it appears that there are conditions under which all of these entities can be considered as "employers" within the meaning of the Act. In developing general principals for its regulations, DOL will look for guidance to the existing statutes such as the National Labor Relations Act (NLRA), the Fair Labor Standards Act (FLSA), the Employee Retirement Income Security Act (ERISA) and interpretations thereunder.

53 Fed.Reg. 43731 (1988).[20]

The Fair Labor Standards Act (FLSA) requires every employer who is engaged in commerce or who is employed in an "enterprise" engaged in commerce to pay employees certain rates. 29 U.S.C. § 206(a). The FLSA defines "enterprise" to mean "the related activities performed (either through unified operations or common control) by any person or persons for a common business purpose...." 29 U.S.C. § 203(r). Additionally, FLSA's definition of "employer" includes "any person acting directly or indirectly in the interest of an employer." Thus, the FLSA has been interpreted to apply to corporate officers who are responsible for managing the corporation's day-to-day affairs. *See Donovan v. Sabine Immigration Co., Inc.*, 695 F.2d 190, 194–95 (5th Cir.1983), cert. denied, 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1387 (1983), (individual who effectively dominates a corporation's administration or otherwise acts, or has power to act, on behalf of the corporation vis-a-vis its employees is an employer under FLSA); *Marchak v. Observer Publications, Inc.*, 493 F.Supp. 278, 282 (D.R.I.1980) ("officers of corporations are routinely held to be 'employers' within the meaning of the FLSA and thus proper parties in actions for unpaid wages and overtime compensation.")

Plaintiffs contend that the definitions contained in and interpretations of the FLSA are relevant in interpreting the WARN Act, and that this Court should therefore conclude that officers and directors of a corporate employer are also employers within the meaning of that Act.

**20.** The final regulations merely restate the statutory language. 20 C.F.R. 639.3(a).

The FLSA is not the only federal statute which governs the activities of "employers" and defines that term to include individuals as well as businesses. For example, Title VII of the Civil Rights Act and the Age Discrimination in Employment Act each define "employer" to include "a *person* engaged in an industry affecting commerce ..." 42 U.S.C. § 2000e; 29 U.S.C. § 621.

However, simply because other statutes involving employers have defined that term to include individuals does not necessitate a finding that the corporate officers and directors in this case can be held liable under the WARN Act. Congress would have been aware of the definitions contained in those other statutes, and that the failure to specifically define "employer" to include individuals as well as business entities would appear to represent an intent that only business entities, not individuals, be included as "employers" under the WARN Act.

The House Conference Committee report discussed the definition of "employer", stating that:

> "*Employer*". The Conference Agreement retains the Senate Amendment language that the term "employer" means a business enterprise. The Conferees intend that a "business enterprise" be deemed synonymous with the term company, firm or business, and that it consists of one or more sites of employment under the common ownership or control. For example, General Motors has dozens of automobile plants throughout the country. Each plant would be considered a site of employment, but as provided in the Bill, there is only one "employer"—General Motors.

1988 U.S.Code Admin.News 2078, 2079. This language supports a conclusion that the definition of employer in the WARN Act was not intended to include officers and directors of a corporate employer.

In interpreting a statute, the starting point for courts is the actual language employed by Congress in the statute. *United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 110 S.Ct. 462, 107 L.Ed.2d 462 (1989); *Sutton v. U.S.*, 819 F.2d 1289 (5th Cir.1987). Where the language is unclear, resort to the legislative history may be necessary to determine Congressional intent. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

In this case, the language of the WARN Act, defining "employer" as a "business enterprise" that employs a certain number of people, suggests that only business entities, not officers and directors of corporate employers, should be considered as employers under the Act. This interpretation is consistent with the House Conference Committee report, quoted above, which states that "business enterprise" was intended to be synonymous with the term company, firm or business. Such a reading would not produce incongruities in the language, nor would it clearly be contrary to the purpose of the statute. The fact that such an interpretation would be inconsistent with the way other statutes have defined the term "employer" does not mean that such an interpretation is wrong, especially considering the fact that Congress could have utilized the same definition in WARN as it used in other statutes but did not do so. Thus, the individual officers and directors of Holmes and Dillard who have been made defendants herein are entitled to summary judgment dismissing them from this action.

*Federal Insurance Company's Motion to Dismiss*

Federal Insurance Company (Federal) issued a policy wherein it agreed to indemnify Holmes' officers and directors for amounts the officers and directors may become legally obligated to pay as a result of claims against them. In view of our determination that the individual corporate officers are not liable under WARN, Federal is entitled to be dismissed from this suit.

*Plaintiffs' Motion to Strike Affidavit*

Plaintiffs' request that the affidavit of Allen Williams, which was submitted in support of defendants' motion for partial summary judgment, be stricken. Williams' affidavit attempts to establish a basis for defendants' contention that certain employees were in fact terminated more than sixty

days from the date they initially received notice and to list part-time and "extra on call" personnel.

Plaintiffs urge several reasons in support of their motion, including that records Williams relied upon were essentially unreliable. We need not address the issues raised by plaintiffs since their motion is moot in view of our denial in part of defendants' motion for partial summary judgment.

*Federal's Motion for Summary Judgment*

█ Defendants [21] filed a cross-claim against Federal seeking indemnity under two fiduciary liability policies issued by Federal, which defendants allege covers damages plaintiffs may recover from them. Federal has filed a motion for summary judgment contending that the policy at issue, by its terms, limits recovery to a breach of a fiduciary duty under an Employee Benefit Plan. Federal argues that any damages plaintiffs would be entitled to recover in this action arise as a result of a violation of WARN and not because of any breach of duty imposed on an administrator of an ERISA plan. Defendants disagree, alleging that language in plaintiffs' Second Amended Complaint [22] raises ERISA related claims which would be covered under the policy.

Federal has attached copies of its policies as exhibits to its motion. The insuring clause appearing on page two of each policy contains the following language:

> The company shall pay on behalf of each insured all losses that an insured becomes legally obligated to pay because of any claim first made against an insured during the policy period or the extended reporting period for a wrongful act committed or attempted, or allegedly committed or attempted, before or during the policy period of an insured or by any person for whose wrongful acts an insured is legally responsible.

The term "wrongful act" is defined in the policies as follows:

(1) With respect to a sponsored plan,

 (a) Any breach of the responsibilities, obligations or duties imposed upon fiduciaries of a plan by the Employer Retirement Income Security Act of 1974 or its amendments or by the common or statutory law of the United States, or any state or other jurisdiction;

 (b) Any other matter claimed against the sponsor organization or an insured person solely because of the insured person's service as a fiduciary of any sponsored plan; and,

 (c) Any negligent act, error or omission in the administration of any sponsored plan; and,

(2) With respect to an insured plan,

 (d) Any negligent act, error or omission in the administration of any insured plan.

Listed among damages an affected employee may recover for a violation of WARN are "... benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not incurred."

Viewing the policies in their entirety, we conclude that their terms are not ambiguous and that they provided coverage essentially for any breach of a fiduciary duty in connection with an employee benefit plan under duties and responsibilities imposed by "... the Employee Retirement Income Security Act of 1974 or its amendments or by the common or statutory law of the United States, or any state or other jurisdiction."

Plaintiffs seek no relief against defendants under ERISA or any other statute or law which imposes duties, obligations or responsibilities on fiduciaries in the admin-

---

**21.** Dillard, Holmes and individual corporate officers.

**22.** Plaintiffs seek benefits for each aggrieved employee under an employee benefit plan, including the cost of medical expenses incurred during the employment loss which would have been covered under the employee benefit plan if the employment loss had not occurred.

istration of employee benefit plans. They are seeking relief for a violation of WARN which happens to include as a category of damages, ERISA benefits that would have been due an employee had he remained employed during the 60 day notice period. WARN imposes no additional duties or obligations on an administrator of an ERISA plan, rather it imposes an obligation on an employer (business enterprise) to pay this category of damages.[23] Federal is entitled to summary judgment on its motion.

---

23. During oral argument on these motions, counsel was uncertain whether Holmes and Dillard themselves were considered administrators of their respective ERISA plans or had appointed individual fiduciaries to those duties. An answer to this question is not necessary to determine the outcome of the motion before us. If an employer happens to be the responsible fiduciary under a plan, the duty to pay the additional benefits for a violation of WARN is placed on the employer as "employer" and not as fiduciary of a plan.