630 A.2d 948

**GEORGIA–PACIFIC CORPORATION, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD
OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 14, 1992.

Decided Aug. 18, 1993.

652

Thomas G. Servodidio, for petitioner.

Frayda Kamber and Randall S. Brandes, for respondent.

Quintes D. Taglioli, for intervenors, Raymond C. Gring, Jr. et al.

Before PALLADINO and FRIEDMAN, JJ., and NARICK, Senior Judge.

FRIEDMAN, Judge.

Georgia–Pacific Corporation (G–P) appeals from orders of the Unemployment Compensation Board of Review (UCBR) affirming a referee's decision to grant benefits to former G–P employees (Claimants) pursuant to sections 401 and 4(u) of The Pennsylvania Unemployment Compensation Law (Law)[1] effective benefit week ending July 14, 1990. We affirm.

In the Spring of 1990, G–P decided to close its facility in Reading, Pennsylvania, thereby terminating all employee positions in that plant. G–P's action was a "plant closing" as that term is defined in the Worker Adjustment and Retraining Notification Act (WARN), Pub.L. No. 100–379, 102 Stat. 891 (1988), 29 U.S.C. §§ 2101–2109, and under section 3(a) of WARN, 29 U.S.C. § 2102(a), an employer must provide 60 days notice to its employees prior to such a closing.[2] On May

---

1. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§ 751–914. Section 401 of the Law, 43 P.S. § 801, provides that "[c]ompensation shall be payable to any employee who is or becomes unemployed...." Section 4(u) of the Law, 43 P.S. § 753(u), defines the term "unemployed" as follows:

   (u) "Unemployed."
   An individual shall be deemed unemployed (I) with respect to any week (i) during which he performs no services for which remuneration is paid or payable to him and *(ii) with respect to which no remuneration is paid or payable to him,* or (II), with respect to any week of less than full-time work if the remuneration paid or payable to him with respect to such week is less than his weekly benefit rate plus his partial benefit credit. (Emphasis added.)

2. This section of WARN provides in pertinent part:

   **(a) Notice to employees, state located worker units, and local governments.—** An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
   (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and

24, 1990, in compliance with WARN, G–P notified the collective bargaining representatives of the affected employees, Local 1526 of the United Paperworkers International Union (Union), the Mayor of Reading and the Director of the Dislocated Worker Unit in Pennsylvania about G–P's decision to permanently close its Reading plant sometime between July 24 and August 7, 1990.

On June 28, 1990, in conjunction with the plant closing, G–P began negotiations with the Union regarding the effects of the plant closure. One day later, these negotiations resulted in a formal closure agreement between G–P and the Union. The closure agreement established July 24, 1990 as the termination date for employees at the Reading facility,[3] allowing employees to accrue vacation time through this date. The agreement also ensured medical insurance coverage and pension credits for G–P employees through August 31, 1990. In addition, the agreement provided for employee entitlement to severance pay based on an employee's length of service with the company.

Although initially intending to remain operational until July 24, 1990, G–P claimed that significant problems developed which made it neither feasible nor desirable to remain open through the time period given in the May 24, 1990 notice and, on June 28, 1990, ceased operations in its Reading plant. However, on July 12, 1990, in keeping with section 5(a) of the WARN provisions, 29 U.S.C. § 2104(a),[4] G–P paid Claimants a

(2) to the State dislocated worker unit (designated or created under title III of the Job Training Partnership Act [29 U.S.C.A. § 1651 et seq.]) and the chief elected official of the unit of local government within which such closing or layoff is to occur.
29 U.S.C. § 2102(a).

**3.** G–P contends that during negotiations of the closure agreement, it never indicated to Union representatives that it would keep the Reading facility open until July 24, 1990. In fact, the closure agreement, finalized on June 29, 1990, postdated the actual plant closing by one day. Rather, the agreement reflected a July 24, 1990 closure date only for purposes of calculating severance pay, holiday pay, insurance and pension benefits that would be paid to employees under the terms of the closure agreement.

**4.** This section of WARN provides in pertinent part:

lump sum in an amount equal to the wages they would have earned had G–P remained open until July 24, 1990. The WARN payment was calculated by multiplying eight times the employee's hourly wage rate by the number of work days between June 28, 1990 and July 24, 1990. When the plant closed, Claimants also received severance pay pursuant to the closure agreement between G–P and the Union.[5] Although the WARN payments were separate and distinct from Claimants' severance payments, any severance eligibility was offset by the amount of the WARN payment due.[6] None of the Claimants performed any actual work or services on behalf of G–P after June 28, 1990.

On October 18, 1990, the Bureau of Unemployment Compensation Benefits and Allowances (Bureau) issued a Notice of Determination, concluding that section 4(u) of the Law did not preclude Claimants from receiving unemployment compensation benefits and determining that WARN payments were not deductible against Claimants' benefit entitlement. G–P ap-

(a) **Civil actions against employers.**—(1) Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for—

(A) *back pay* for each day of violation at a rate of compensation not less than the higher of—

(i) the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii) the final regular rate received by such employee.

29 U.S.C. § 2104(a)(1)(A). (Emphasis added.)

5. In addition, the closure agreement provided that five of the most senior union employees each receive $2,500 to relinquish their claims to any incidental work at G–P's satellite warehouse which might have been available following the shutdown at the Reading plant.

6. So that, for example, one claimant who was to receive a severance payment of $2,500.00 based on his previous years of service, actually was paid $1,331.44 in WARN payments and $1,168.56 in severance pay. We must note that WARN payments may not always be reduced by severance payments. *See* 29 U.S.C. § 2104(a)(2); H.R.Rep. No. 576, 100th Cong., 2nd Session at 1053 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 2078, 2086; *Carpenters District Council of New Orleans v. Dillard Department Stores, Inc.,* 778 F.Supp. 297 (E.D.La. 1991). However, we have not been asked to address the propriety of the offset here.

pealed and, following a hearing,[7] the referee affirmed the Bureau's decision, agreeing that because the WARN payments were not remuneration within the meaning of section 4(u), Claimants remained eligible for benefits for the period covered by WARN payments. G–P then appealed to the UCBR, which issued a decision on May 15, 1991, reversing the referee and denying benefits to Claimants for the weeks at issue.

On May 30, 1991, the Bureau filed a request for reconsideration with the UCBR which the UCBR granted, vacating its earlier decisions and orders and granting the Bureau's request for oral argument. Following argument, the UCBR issued new orders affirming the referee's decision and granting benefits to each of the Claimants pursuant to sections 4(u) and 401 of the Law. The UCBR concluded that because Claimants did not perform any work following the plant closing on June 28, 1990, the WARN payments could not be considered as payment for services performed following Claimants' separation but rather were payments arising from statute which did not represent remuneration for the weeks at issue. G–P then appealed to this court, following which Claimants and the Bureau filed Notices of Intervention.

On appeal, G–P raises two issues for our consideration. First, G–P contends that the UCBR abused its discretion when it granted the Bureau's Request for Reconsideration. Second, G–P argues that the UCBR erred in granting benefits to Claimants for the period covered by WARN payments.

## I. REQUEST FOR RECONSIDERATION

Because the decision to grant or deny a request for reconsideration is a matter of administrative discretion, this court's scope of review of that decision is limited to determining whether the agency abused its discretion. *Keith v. Department of Public Welfare*, 121 Pa.Commonwealth Ct. 405, 551 A.2d 333 (1988). An abuse of discretion occurs if the

---

7. At the hearing, which was attended by representatives of Claimants, G–P and the Bureau, the referee consolidated the group of approximately sixty-three (63) similarly situated Claimants covered in G–P's appeal.

agency decision demonstrates evidence of bad faith, fraud, capricious action or abuse of power. *J.A.M. Cab Co., Inc. v. Pennsylvania Public Utility Commission*, 132 Pa.Commonwealth Ct. 390, 572 A.2d 1317 (1990). The party asserting such abuse of discretion has the burden of proving that it occurred. *Pennsylvania State Association of Township Supervisors v. State Ethics Commission*, 92 Pa.Commonwealth Ct. 544, 499 A.2d 735 (1985). In addition, the UCBR's own regulations provide that it may grant a request for reconsideration and rehearing for "good cause" and that the ruling of the UCBR in that regard is subject to review by this court. 34 Pa.Code § 101.111; *Bennett v. Unemployment Compensation Board of Review*, 79 Pa.Commonwealth Ct. 625, 470 A.2d 203 (1984).

■ Initially, G–P contends that the UCBR acted capriciously by granting reconsideration without first considering G–P's opposing arguments. G–P asserts that the UCBR allowed G–P until June 11, 1991 to object formally to the Bureau's request for reconsideration, and that G–P timely filed these objections on June 10, 1991. However, G–P argues that the UCBR abused its discretion when it prematurely vacated its prior decisions and granted reconsideration on June 5, 1991, before receiving G–P's objections.[8]

With regard to this assertion, we agree that the UCBR failed to consider G–P's objections before granting the Bureau's request for reconsideration; however, we disagree that the UCBR abused its discretion by doing so. Although G–P infers otherwise, the UCBR need not provide an affected

---

8. There is some dispute over these dates. Claimants contend that G–P's argument is totally without merit because G–P actually filed its memorandum in opposition to the request for reconsideration on June 7, 1991, and that the UCBR did not issue its decision granting the request until June 11, 1991. However, contrary to these assertions, G–P argues that although it served its memorandum on June 7, 1991, the memorandum was not received and filed by the UCBR until June 10, 1991. Moreover, G–P claims that although the UCBR issued its decision on June 11, 1991, it had already determined that it would vacate and reconsider its prior decision on June 5, 1991. We need not resolve this dispute because, for the purposes of this opinion, it does not matter which party is correct.

party with the opportunity to object to a request for reconsideration. In fact, 1 Pa.Code § 35.241(c) of the General Rules of Administrative Practice and Procedure specifically provides that "[n]o answers to petitions for rehearing or reconsideration will be entertained by the agency." Instead, if the petition is granted, a participant may file a response in the nature of an answer within 15 days of the order granting rehearing or reconsideration. *Id.*

In *Unemployment Compensation Board of Review v. Holley,* 24 Pa.Commonwealth Ct. 16, 353 A.2d 905 (1976), an employer requested reconsideration of a UCBR order granting benefits to the claimant. Without notifying the claimant of this request, the UCBR vacated its prior order and "reopened" the case, directing that a new hearing be held. The claimant took part in the new hearing, following which the UCBR denied him benefits. On appeal, the claimant maintained that the UCBR could not act upon a request for reconsideration without first providing him the opportunity to oppose the request. However, we found no error in the UCBR procedure, reasoning that although the UCBR could not vacate an order on its own motion, absent a request for reconsideration or the granting of an opportunity to be heard, the claimant had been afforded that opportunity at the new hearing. Here too, G–P was given an opportunity to be heard by submitting its memorandum in opposition to the grant of reconsideration and fully arguing its position at oral argument. Due process has not been denied where a party has appropriate notice of an administrative procedure and an opportunity to be heard by oral argument or brief before an agency reverses a substantive decision and the matter becomes final. *Kentucky Fried Chicken of Altoona, Inc. v. Unemployment Compensation Board of Review,* 10 Pa.Commonwealth Ct. 90, 309 A.2d 165 (1973); *Commonwealth v. Lentz,* 353 Pa. 98, 44 A.2d 291 (1945).

Citing 34 Pa.Code § 101.111(b),[9] G–P also argues that because the evidence of record provided no "good cause" in the

___

9. This regulation provides as follows:

interest of justice warranting reconsideration, the UCBR abused its discretion by granting the Bureau's request in this case. We recognize that the UCBR may grant a request for reconsideration and rehearing only where there is "good cause" to do so. *Bennett.* In determining whether "good cause" exists, the agency must consider whether the party requesting reconsideration has presented new evidence or changed circumstances or failed to consider relevant law. *J.A.M. Cab.* However, we have held that the UCBR had no good cause to grant a rehearing where the requesting party did not act to protect its own interests by presenting crucial evidence at the initial hearing and asserted no reason for its failure to make the "new" evidence available at that time. *Commonwealth Department of Auditor General v. Unemployment Compensation Board of Review,* 86 Pa.Commonwealth Ct. 274, 484 A.2d 829 (1984); *Asplundh Tree Expert Co. v. Unemployment Compensation Board of Review,* 80 Pa.Commonwealth Ct. 7, 470 A.2d 1097 (1984); *Bennett; Medical College of Pennsylvania v. Unemployment Compensation Board of Review,* 59 Pa.Commonwealth Ct. 411, 429 A.2d 1270 (1981); *Flanagan v. Unemployment Compensation Board of Review,* 47 Pa.Commonwealth Ct. 120, 407 A.2d 471 (1979).

Relying on these last cases, G–P contends that because the request for reconsideration offered no new evidence or legal authorities, the Bureau did nothing more than request the UCBR to readdress legal issues which it had already resolved in its May 15, 1991 decision. We disagree.

(a) Within 15 days after the issuance of the decision of the Board, ... any aggrieved party may request the Board to reconsider its decision and if allowed, to grant further the opportunity to do the following.
    (1) Offer additional evidence at another hearing.
    (2) Submit written or oral argument.
    (3) Request the Board to reconsider the previously established record of evidence.
(b) *The requests will be granted only for good cause in the interest of justice without prejudice to any party.* The parties will be notified of the ruling of the Board on each such request. The request for reconsideration and the ruling of the Board shall be made a part of the record and subject to review in connection with any further appeal to the Commonwealth Court.
34 Pa.Code § 101.111. (Emphasis added).

■ First, we note that in all the previously cited cases, reconsideration was deemed improper because the party sought it as a means of belatedly presenting *factual evidence* which had been available at the initial hearing. The Bureau does not attempt to adduce such evidence on reconsideration here; therefore, these cases are inapplicable. What the Bureau does request is that the UCBR reconsider the legal basis for its decision. With regard to legal questions which have been raised, the inquiry is whether legal theories or authorities were previously unconsidered; there is no requirement that these theories or authorities be newly discovered or previously unavailable. *J.A.M. Cab.*

■ In *J.A.M. Cab*, we affirmed the Public Utilities Commission (PUC) denial of a cab company's request for reconsideration, concluding that in its request, the cab company raised the same legal arguments that the PUC had *previously addressed, considered and resolved to its satisfaction.* Here too, the Bureau presented no "new" legal theories to support its position; however, that does not necessarily mean reconsideration was inappropriate. If the UCBR felt it had not addressed or properly resolved the Bureau's legal issues in its initial decision and, desirous of the opportunity to do so, granted reconsideration, this could hardly be considered an abuse of discretion.

Similarly, G–P argues that the Bureau failed to protect its interest prior to the UCBR's first decision, either at the initial hearing or before the UCBR, and so cannot seek another opportunity to argue its case now. However, there is no support for the contention that the Bureau waived its right to reconsideration by not acting to protect its rights at the initial hearing. Here, the Bureau clearly enunciated its interpretation of the law in its Notice of Determination and also had a representative present at the referee's hearing. On appeal, the UCBR was to review the record already adduced, a situation which posed no problem for the Bureau. Indeed, the Bureau is satisfied that the record is complete and does not

seek to add to it on reconsideration.[10]   Again, this is in stark
contrast to those cases where the party sought reconsideration
in order to introduce additional factual evidence into the
record, evidence which it could have presented earlier in the
proceedings.   In these circumstances, we determined that no
good cause for reconsideration existed because the parties had
not fully protected their interests.   That is not this case.

Here, in its initial decision, the UCBR reversed the Bureau
and the referee in one sentence, finding "that the WARN
payment does preclude Claimant from receiving unemploy-
ment benefits, as that payment constitutes remuneration with
respect to the weeks at issue."   (R.R. at 80a.)   Because this
decision was devoid of explanation, the Bureau reasons that
the UCBR must, as a proper exercise of its discretion, have
the right to reevaluate or reconsider a decision and admit that
"points of law or fact [may] have been overlooked or misappre-
hended...."   Pa.R.A.P. 2544 (giving courts the discretionary
power to grant reargument on these grounds).   Indeed, the
Bureau contends that the correction of perceived legal errors
is an essential part of the proper exercise of discretion and
that the UCBR would have abused this power had it refused
to reconsider and redetermine the matter to correct its own
error.   *See United States v. Ibarra,* — U.S. —, 112 S.Ct. 4,
116 L.Ed.2d 1 (1991) (rehearing is a viable tool, whether an
error be one of fact or law, giving lower courts the opportunity
to correct their own alleged errors, thereby preventing unnec-
essary burdens on the courts of appeals).   The Bureau urges
that in the interests of justice, an agency, no less than a court,
should be encouraged to review its decisions for manifest
errors of law.

▮▮▮ G–P refutes this argument by stating that the
UCBR never indicated that it had overlooked or misappre-
hended any law in reaching its initial decision, noting that

---

**10.**  The Bureau's request for reconsideration merely reiterates the legal
authorities which it relied upon in its October 18, 1990 determination,
attaching a copy of this decision to support its request.   Because there
was no factual dispute and the law did not change in the interim, G–P
was not prejudiced by the UCBR's reconsideration of its prior decision.

none of the UCBR members indicated that the prior decision was erroneous. It is true that the UCBR never admitted that its prior determination was wrong, either in its grant of reconsideration or in its ultimate reversal; however, we do not believe such a declaration was necessary. Here, the UCBR chairman and its deputy chief counsel recommended reconsideration, recognizing that although the important issue presented by this case deserved extensive consideration, the UCBR had inadequately explained the legal basis upon which its May 15, 1991 decision rested. (Petitioner's brief, Appendix B, Exhibits A and D.) The UCBR simply was aware that because of its incomplete analysis, it had not properly addressed dispositive legal authority. *See J.A.M. Cab.* Thus, even in the absence of a clear statement announcing that its prior decision was erroneous, the UCBR presented valid and appropriate reasons to reconsider that decision, constituting "good cause in the interest of justice." Cognizant of the deficiencies in its initial decision, the UCBR granted the Bureau's request for reconsideration; it did not abuse its discretion in doing so.

## II. WARN PAYMENTS

The crucial issue for our review,[11] raised for the first time in Pennsylvania, is whether WARN payments are remuneration within the meaning of section 4(u) of the Law, so that receipt of such payments would preclude a claimant from entitlement to unemployment compensation benefits.

It is axiomatic that a claimant's eligibility for unemployment compensation benefits depends first upon his being unemployed. Under section 4(u) of the Law, 43 P.S. § 753(u), an individual is deemed unemployed (i) if he performs no remunerated services during a claim week *and* (ii) if he is paid or owed no remuneration with respect to such week. Here, it is undisputed that Claimants performed no services for G–P

---

11. Our scope of review is limited to determining whether constitutional rights have been violated, an error of law has been committed and whether all findings of fact are supported by substantial evidence. *Moore v. Unemployment Compensation Board of Review,* 134 Pa.Commonwealth Ct. 274, 578 A.2d 606 (1990).

after June 28, 1990; thus, as G–P admits, Claimants satisfy the first requirement of unemployment. However, under subsection (ii), a claimant is not considered "unemployed" even though he performs no actual services during a particular claim week if he is paid or owed remuneration with respect to that week. G–P argues that the lump sum WARN payments that Claimants received represented the wages they would have earned in the event they had actually worked throughout the 60–day notice period. Based on this analysis, G–P asserts that Claimants received remuneration with respect to the claim weeks at issue here and, therefore, under section 4(u)(ii), they were not unemployed during that period. We must disagree.

Although the Unemployment Compensation Law does not specifically define the term, Pennsylvania case law has repeatedly defined remuneration as "payment for services performed." *See, e.g., Gianfelice Unemployment Compensation Case*, 396 Pa. 545, 555, 153 A.2d 906, 911 (1959); *Pennsylvania Electric Co. v. Unemployment Compensation Board of Review*, 73 Pa.Commonwealth Ct. 258, 458 A.2d 626 (1983); *Hock v. Unemployment Compensation Board of Review*, 50 Pa.Commonwealth Ct. 517, 413 A.2d 444 (1980). In *Hock*, we recognized this definition and concluded that whereas eligibility is easily determined under subsection (i), a claimant's eligibility for benefits under subsection (ii) depended upon "an understanding of the phrase 'with respect to [ ].' Merely because the payments were made during the weeks at issue does not mean that they were made *with respect to* those weeks." *Id.* at 522, 413 A.2d at 446. (Emphasis in original.) Thus, we determined that the question under subsection (ii) is when the services were performed for which the claimant received payment. *Id.*[12] Clearly then, Claimants here are

12. In *Hock*, we considered whether a claimant was entitled to receive both termination benefits and unemployment compensation. In that case, as part of a staff reduction, a corporate attorney was terminated from his position after eleven years of employment. In the period following the dismissal, the employer paid the attorney benefits amounting to 11 weeks of his prior salary. We determined that these payments did not disqualify him from receiving unemployment compensation because they represented payments in recognition of the

unemployed under subsection (ii) because the WARN payments, although made "with respect to" the claim weeks at issue, were not made in recognition of any services Claimants performed for G–P either during those weeks or at any other time. In short, they were not remuneration.[13]

Although conceding that remuneration generally is defined as payment for services performed, G–P nevertheless argues that this definition is improper here. Noting that the language of subsection (ii) makes no reference to the performance of services, G–P claims that to interpret "remuneration" as payment for services performed would render section 4(u)(ii) duplicative of section 4(u)(i) and, therefore, meaningless. Because the Legislature is not presumed to have intended the provisions of its enactments as mere surplusage, *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977); *In Re DeYoung*, 129 Pa.Commonwealth Ct. 265, 565 A.2d 226 (1989); 1 Pa.C.S. § 1903(a), G–P urges us to reject our well-established definition of remuneration, claiming it does not give

claimant's past service to his employer rather than remuneration with respect to those weeks.

**13.** In this regard, G–P contends that this case is controlled by *Partridge v. Unemployment Compensation Board of Review*, 60 Pa.Commonwealth Ct. 47, 430 A.2d 735 (1981). We disagree. In *Partridge*, a teacher who was paid based on a twelve month September to September work year, learned in June that due to declining enrollment, he would no longer be employed with the school district as of September. The teacher then elected to receive a lump sum salary payment in June covering his wage for June, July and August; he also filed an application for unemployment compensation benefits for the same three month period. We determined that the teacher was ineligible for benefits during that period because, although he did not teach during the summer months, he remained employed by the school district.

G–P asserts that Claimants here are in precisely the same position as the teacher in *Partridge*. That is, G–P also paid Claimants a lump sum representing the wages they were entitled to receive for the remainder of the 60–day notice period *as if* Claimants had worked during these weeks. However, this analysis is flawed. Remuneration in the context of unemployment compensation refers to payment for services performed. The teacher in *Partridge* received payment for such services which, although performed during the nine-month school term, were payable with respect to the summer months in accordance with the teacher's choice to be paid over his entire twelve month work year. In contrast, Claimants here performed no services for which G–P either made or owed payment during the weeks at issue.

effect to all the statutory language of section 4(u). Instead, G–P refers us to our decisions in *General Teamsters Union Local No. 249 v. Unemployment Compensation Board of Review,* 74 Pa.Commonwealth Ct. 456, 459 A.2d 1363 (1983) and *White v. Unemployment Compensation Board of Review,* 36 Pa.Commonwealth Ct. 258, 387 A.2d 943 (1978) for alternate definitions of remuneration.

In *General Teamsters,* a union reimbursed shop stewards for the wages lost from their full time employment while performing union business during work hours. In contending that the shop stewards were not union employees, the union argued that its payments to the shop stewards were not wages but merely reimbursement for wages lost from their regular employment. We utilized the common dictionary meaning of remuneration; i.e., "an equivalent [paid] for a service, loss or expense," *Id.* at 459, 459 A.2d at 1365, citing Websters Third New International Dictionary 1921 (1966 Ed.), and determined that the union's payment of the shop steward's losses were wages. Relying on that case, G–P contends that WARN payments qualify as remuneration because, like the payments in *General Teamsters,* they represent loss of wages owed Claimants with respect to the claim weeks at issue here. However, G–P's reliance on *General Teamsters* is misplaced. Although referred to as payments for loss, the reimbursement payments actually constituted remuneration from the union to the shop stewards as payment for services they performed for the union. *See Whitling v. Unemployment Compensation Board of Review,* 95 Pa.Commonwealth Ct. 500, 505 A.2d 1101 (1986), *appeal denied,* 514 Pa. 640, 523 A.2d 346 (1987).

Again relying on the characterization of WARN payments as lost wages, G–P asserts that the public policy underlying Unemployment Compensation Law supports its position. First G–P suggests that the Law justifies benefits only where an individual loses wages due to unemployment.[14] Thus, G–P

14. G–P refers specifically to section 3 of the Law, that portion of the Law's declaration of public policy which states:

Security against unemployment and the spread of indigency can best be provided by the systematic setting aside of financial reserves to be

contends that because Claimants received their full wages during the weeks at issue, allowing them to receive unemployment compensation as well as wages would provide them with a double recovery and undermine the unemployment compensation system.[15] We must disagree with the premise of this argument.

The WARN payment is not intended as a means of replacing lost wages; rather, it is "to provide an incentive and a mechanism for employers to satisfy their obligations to their employees in the event they fail to provide 60 days advance notice [of plant closure] to their employees." [16] H.R.Rep. No. 576, 100th Cong., 2nd Session at 1053 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2086. WARN payments then are damages owed employees for suffering an unexpected employment loss where they had a rightful expectation of continued employment with that employer. Therefore, the pertinent question

used as compensation for *loss of wages* by employes during periods when they become unemployed through no fault of their own.
43 P.S. § 752. (Emphasis added.)

15. Similarly, G–P contends that the individual $2,500 payments made to five most senior employees (see footnote 5 of this opinion) were remuneration since they were made in lieu of wages the five claimants might otherwise have earned during the claim weeks at issue. However, we agree with the UCBR that these payments were not remuneration for services performed but an exchange paid for the relinquishment of those employees' right to work following the shutdown.

16. We must note that, contrary to Intervenors' assertion that WARN payments are, in effect, a penalty imposed on an employer who has violated the WARN notice provision, an employer's liability to its ex-employees should not be viewed as a penalty. Rather, WARN payments are in the nature of compensatory, not punitive, damages. Congress specifically provided for penalties in the WARN Act which are separate and distinct from the obligations of the employer to its former employees. 29 U.S.C. § 2104(a)(3). In this regard, the Bankruptcy Court for the Northern District of Iowa stated:

WARN itself describes the employer's liability to an employee as "back pay" ... [and] Congress described the employer's liability to a local government unit as a "penalty." ... Congress is presumed to know the meanings of the words which it employs and to intend their plain and ordinary application.... Congress could have, but did not label the employer's liability to the employee as a penalty.

*In re Cargo Inc.*, 138 B.R. 923 (N.D.Iowa 1992). In fact, an employer can eliminate even this penalty by full and prompt payment of its financial liability to its employees. 29 U.S.C. § 2104(a)(3).

under WARN is whether an employee has received the notice provided by law, not whether the employee lost wages or benefits during the period when he or she should have had knowledge of the closing. This concept is supported by the language of WARN itself.

WARN provisions require an employer to give notice to each "affected employee," 29 U.S.C. § 2102(a), a term defined to include "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5). Based on this definition, employees on temporary layoff status have been determined to be entitled to receive notice under WARN and to recover WARN damages for inadequate notice, although those employees were drawing no salary when the plant was closed. *Jones v. Kayser–Roth Hosiery, Inc.,* 748 F.Supp. 1292 (E.D.Tenn.1990). Because they reasonably expected to return to work, these employees suffered no less and no different harm as a result of the employer's failure to comply with WARN than those employees on the active payroll. *Jones.*

Moreover, because the WARN payments are designed to deter the employer from closing the plant without providing employees with adequate notice, the offending employer alone must make payment for its WARN violation. Thus, wages received from another employer, or unemployment compensation payments received from the State, may not be used to offset the employer's obligation. H.R.Rep. No. 576, 100th Cong., 2nd Session at 1053 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2086.

G–P, however, argues that the language and legislative history of the WARN Act supports the concept that WARN payments are remuneration. First, G–P points out that under WARN, a violating employer is liable to aggrieved employees for "back pay." Because the calculation of this "back pay" is based on an employee's regular wage rate, 29 U.S.C. § 2104(a), G–P reasons that the language of WARN supports the conclusion that WARN payments are akin to wages and so

constitute remuneration under the Law. In addition, G–P asserts that the legislative history of the WARN Act recognizes that WARN payments represent employee wages by providing that "for each day of violation, an employer is liable to each aggrieved employee for the amount paid in *wages* and benefits to such employee prior to the layoff. . . ." H.R.Rep. No. 576, 100th Cong., 2nd Session at 1052 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2078, 2085 (Emphasis added).

We are not persuaded by these arguments. The enforcement provisions of the WARN Act, in requiring the employer to tender back pay to employees in order to vindicate its violation of WARN, bases that reparation on the amount of an aggrieved employee's wages as a convenient and logical measure of damages. **However, merely because wage amounts form the basis for the formula by which to calculate the WARN payments, those payments are not lost wages; they are damages owed for violation of WARN's notice requirements.** Congress expressed this intent through the clear statutory language in WARN's liability provisions by requiring a violating employer to be liable to an aggrieved employee for "back pay" multiplied by the number of days of violation, not the actual number of days of lost wages.[17]

*Carpenters District Council of New Orleans v. Dillard Department Stores, Inc.,* 778 F.Supp. 297 (E.D.La.1991), is instructive in this regard. In that case, the court considered an employer's argument regarding the method of *calculating* its liability under WARN and stated:

Defendants contend that the WARN Act, as a remedial statute, was intended to place the affected employees in the position they would have been in had no violation—in other

---

**17.** In fact, although they cannot fall short of the amount an employee might have earned without the violation, the amount of WARN payments owed may well exceed that amount. That possibility exists because the back pay formula is based on a rate of compensation not less than *the higher of* an employee's average rate during the prior three years of employment or the rate that the employee was being paid when the plant closed. Moreover, a displaced employee might obtain an award of damages under WARN and yet obtain a new job quickly enough so that he or she suffers no lost work days; however, in this event, WARN payments are not forfeited.

words, if they had the full 60 days notice required by WARN. Thus, employees should be compensated for the actual number of days they would have worked during the period of the WARN violation. Defendants contend that to hold otherwise would convert WARN Act from a remedial statute into a punitive statute.... We see nothing in the Act which supports defendants' interpretation. The liability provisions of the Act are clear, eliminating any need for a resort to outside sources to determine Congress' intent. 'An employer ... shall be liable ... for *back pay for each day of violation*....' § 2104(a)(1)(A).

*Carpenters,* 778 F.Supp. at 308–309. (Emphasis added in original.) In establishing this formula, Congress recognized the distinction between the employer's violation and the employees' losses and based the calculation on the former. As *Carpenters* explains:

There is no rational explanation for inclusion in the Act of the phrase 'for each day of violation' if Congress intended to limit an employee's recovery only to *wages* he would have earned during the period of the violation.

*Id.* at 309. (Emphasis added.)

G–P also attempts to analogize *Social Security Board of Review v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946), to this situation. In *Nierotko,* an employer violated the National Labor Relations Act (NLRA)[18] by terminating an employee because of the employee's union activities. The National Labor Relations Board (NLRB) awarded the employee reinstatement with back pay, and the United States Supreme Court determined that such back pay constituted wages or remuneration under the Social Security Act,[19] stating that "in requiring reparation to the employee through 'back pay,' reparation is based upon the loss of wages which the employee has suffered from the employer's wrong." *Id.* at 364, 66 S.Ct. at 641. "In short, an employer must pay wages ... [because], in violation of law, he has subjected his employee to forced

18. 29 U.S.C. § 160(c).
19. 42 U.S.C. § 405(c)(3).

idleness." *Id.* at 371, 66 S.Ct. at 644. *Nierotko's* rationale does not apply here. As we have already determined, WARN payments, although using wage amounts in their calculation, are not based upon the prematurely discharged employees' loss of wages.

Yet, G–P notes that based on *Nierotko,* we have held that a back pay award for wrongful discharge under the NLRA constitutes remuneration in the context of section 401(f) of the unemployment compensation law, 43 P.S. § 801(f).[20] *White.* In *White,* a discharged employee who was denied unemployment compensation on grounds of willful misconduct subsequently received an award from the NLRB. We agreed that the award by the NLRB was properly characterized as back pay, finding support for that conclusion in the wording of the award notice posted at the direction of the NLRB, stating "[employer] WILL make [wrongfully discharged employee] *whole for the loss of pay suffered* as a result of alleged discrimination against him ..." *Id.* 36 Pa.Commonwealth Ct. at 260, 387 A.2d at 945. (Emphasis added.) We then concluded that a back pay award by the NLRB constitutes remuneration for services so as to purge an employee from his earlier disqualifying conduct. We do not question the reasoning in *White;* however, we agree with the Arizona Court of Appeals in *Capitol Castings, Inc. v. Arizona Department of Economic Security,* 171 Ariz. 57, 828 P.2d 781 (App.1992), when that court stated "we will not assume Congress intended its use of the term 'backpay' [as used in WARN] to control a recipient's eligibility for state unemployment benefits." *Id.* 828 P.2d at 785. Indeed, G–P's attempt to analogize the back pay awards under the NLRA, considered in *Nierotko* and *White,* to the WARN payments here misconstrues the nature of back pay in each case. The important distinction lies in the opportunity for reinstatement that exists in the former situation; that is, in the case of an award under the NLRA, the employee is

**20.** This section provides a means by which unemployed persons, previously separated from employment under circumstances which disqualified them from receiving unemployment benefits, can purge themselves of their earlier disqualifying conduct by receiving sufficient remuneration for services.

terminated, whereas in WARN cases, the job itself is eliminated.

Although initially confusing, on further thought, the distinction becomes readily apparent. The pertinent elements of the NLRB award include (1) a continuing job (2) which the employee was entitled and available to perform but (3) from which he has been terminated through no fault of the employee. On the other hand, WARN payments are owed when (1) the employer prematurely eliminates a job (2) which an employee was entitled and available to perform but (3) which was discontinued through no fault of the employee. The purpose of reparation under the NLRA then is to make the wronged employee whole, first by reinstating that employee to the job from which he or she was wrongfully discharged and secondly, where appropriate, by paying the employee for wages lost between the period of wrongful discharge and reinstatement. Said another way, "back pay" in the context of the NLRA, is intended as a replacement for any loss of wages which the employee has suffered from the employer's wrongful action. *Nierotko.* In applying this rationale to whether unemployment compensation is in addition to or set off against WARN payments, we again look to the purposes of the NLRA and WARN.

A claimant seeking redress in the nature of specific performance for wrongful discharge under the NLRA is entitled to be made whole through reinstatement and back pay. Reinstatement is the remedy to prevent future loss; back pay of wages lost during the period between discharge and reinstatement is the remedy for the period of past loss. A claimant who has been made whole is entitled to no additional benefit. Thus, in the event claimant was receiving unemployment compensation during the interval prior to reinstatement, the overpayment would be subject to recoupment, 43 P.S. § 865,[21] because the wrongfully discharged claimant remained an em-

---

21. Section 705 of the Law, 43 P.S. § 865 provides:

Recoupment and/or setoff of benefits paid to a discharged employe, if any, shall be determined from employe's gross, not net, back wages if employe is reinstated by arbitrator with back pay during period back pay is awarded.

ployee under the definition of the NLRA, although the employer attempted to terminate the relationship. *Nierotko.*

This same analysis cannot be made in the context of WARN payments. In the latter case, the prematurely terminated Claimants performed no services but, unlike the NLRA claimant, performance by WARN Claimants was an impossibility; no services can be performed in a plant that has closed. Therefore, the WARN payment, although labeled as back pay, is only a measure of damages for an employer's violation of notice requirements. The payment is not remuneration within the meaning of section 4(u) of the Law and, thus, Claimants were unemployed and entitled to unemployment compensation for the benefit week ending July 14, 1990.[22]

## III. CONCLUSION

The purpose of the WARN payment is to effectuate the policies of the WARN Act, i.e., to create the needed incentive for *employers* to prevent plant closings or mass layoffs without warning. Thus, *restitution for the notice violation may be made only by the employer* and may not be set off against any other rights which flow from the employment loss and for which Claimants have entitlement under other federal or state

---

**22.** In *Hock v. Unemployment Compensation Board of Review*, 50 Pa.Commonwealth Ct. 517, 413 A.2d 444 (1980), we first discussed the evolution of section 4(u) of the Law. From 1949 until eliminated by amendment in 1964, section 4(u) specifically provided that:

> (i) vacation pay and similar payments, whether or not legally required to be paid, and (ii) *wages in lieu of notice*, separation allowances, dismissal wages and similar payments, *which are legally required to be paid, shall be deemed,* in accordance with rules and regulations of the department, *remuneration paid or payable with respect to the week or weeks for which such payments are made.* (Emphasis added.)

Noting that "a change of language in subsequent statutes on the same matter indicates a change of legislative intent," *Haughey v. Dillon*, 379 Pa. 1, 6, 108 A.2d 69, 72 (1954); *Masland v. Bachman*, 473 Pa. 280, 289, 374 A.2d 517, 521 (1977), we determined that the deletion of this proviso signalled the legislature's desire to alter the meaning of section 4(u) so that a claimant's receipt of these payments would not automatically preclude the claimant from receiving unemployment compensation benefits as well.

laws. Accordingly, we affirm the UCBR's grant of state unemployment compensation benefits to Claimants.

## ORDER

AND NOW, this 18th day of August, 1993, the order of the Unemployment Compensation Board of Review, dated September 23, 1991, is affirmed.